Frances Sheakley, Pro Se
Registration No. 14832-006
Federal Prison Camp
5675 8th Street, Camp Parks
Dublin, Ca. 94568

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

FRANCES SHEAKLEY,

Petitioner,

vs.

WARDEN, LEMON CREEK CORRECTIONAL CENTER, BUREAU OF PRISONS, DOES ONE THRU FIVE.

Respondent.

CASE NO. 1:03cr-013 RRB

PETITION FOR WRIT OF HABEAS CORPUS

TO THE UNITED STATES DISTRICT COURT

The Petition of FRANCES SHEAKLEY for a Writ of Habeas Corpus respectfully shows to this Court, and alleges, the following:

1. I am the Petitioner herein, a person in federal custody of the Bureau of Prisons, U.S. Department of Justice, since August 25, 2003;

2. I am currently incarcerated at the Federal Prison Camp, 5675 8th Street-Camp Parks, Dublin, California, 94568, since July 30, 2004;

3. I am presently serving a sentence for 80 months imposed by the U.S. District Court for the State of Alaska on May 12, 2004, and my projected date of release is December 16, 2008;

4. I file this Petition to show cause for a Writ of Habeas Corpus and with respect thereto would show the court the following:

STATEMENT OF FACTS

1. On October 15, 2003, Relator (Petitioner herein) was imprisoned at Lemon Creek Correctional Center, Juneau, Alaska;

2. At about 7:30 A.M. after breakfast, Relator and two other female inmates were enroute to their cell when one, Inmate Lynda Olsen, was swapping words with Relator thru another inmate;

3. Under the assumption that an argument was occurring, an Officer Workman pulled Inmate Sue Dougherty ("Dougherty") and Inmate Lynda Olsen ("Olsen") out of line;

4. Relator stepped forward and defended Dougherty since she was defending Relator from Olsen; it was at this time that Officer Workman also pulled Relator out of line;

5. While all other women entered the dorm, Officer Workman then called the Booking Area on his hand-held radio and advised an Officer Wilson he was sending three inmates to see Sergeant Bonn;

6. In the meantime, Relator together with Olsen and Dougherty were placed in what they referred to as "the Cage" - the cell where new arrivals are housed when they are initially "booked";

7. As seargeant Bonn told all three inmates to "duke it out - and they won't watch", Relator and Dougherty were talking in a whisper that Olsen was a "troublemaker" but they won't comply with the "duke it out" suggestion;

8. Because of new "commits", Relator and the other two inmates were moved to a camera cell where the blankets were still messed up from the last tenant and the commode was not flushed and full of urine, etc.;

9. About five minutes thereafter, Officer Wilson came and removed the mattress and blankets and said: "This way you won't need to get comfortable and they won't be in the way - and now you can 'duke it out' and get it the f... over with.";

10. As Officer Wilson shut both doors (one with bars and one with solid steel), Olsen yelled to Officer Wilson inquiring if she would get a "write-up" and Officer Wilson yelled back saying: "Nobody will get a write-up.";

11. Immediately Olsen took strips of toilet paper dipped them in the commode full of urine and three urine-soaked paper at the Relator and Dougherty -- most of the paper falling on Relator since Dougherty was hiding behind Relator;

12. Olsen provoked Relator pushing her, laid her hands on Relator as she bent down to take her left shoe off. A struggle occurred when Relator grabbed the end of her shoe and both Relator and Olsen landed on the floor with Olsen's feet on Relator's stomach continuously kicking her over and over;

13. After several screaming and crying at the same time, Relator and Olsen reached an understanding and began to call for Sergeant Bonn. Waiting to go to lunch at 11:00 A.M., and while sitting with her knees up to her chest, Relator felt pain and a "poking" sensation from her chest;

14. On the way to lunch, Relator asked to see the Physician's Assistant (PA) but it wasn't till after lunch that Relator saw the P.A. Rob who evaluated Relator and told Relator that her ribs "were broken":

15. Relator had persistently asked for x-rays, but all the P.A. Rob and Nurse Shirley could say was that there was nothing much that could be done for "broken ribs";

16. Later, Superintendent Corothers and Lieutenant Preston were waiting in Lt. Preston's office and each one of the inmates had been interviewed separately. Superintendent Corothers said the story coincided with what they saw in the tape. Relator

told both Superintendent Corothers and Lt. Preston that had pain on her right side; however, they nonchalantly discount her plea for help, and all were sent back to the dorm;

17. Relator sought and made every attempt to seek relief for the pain and became so frustrated because no one was responding. Relator then decided to contact the Juneau Police Department to file charges but was referred to the Alaska State Troopers;

18. Upon contacting the Alaska State Troopers, Trooper Umbs came to see the Relator and took her complaint and reviewed the camera cell tape. Trooper Umbs also had Relator sign a document for medical assistance;

19. Relator submitted several numerous cop-outs for x-rays (copies of cop-outs are in Relator's possession); However, the PA has consistently denied scheduling Relator for the x-rays;

20. Relator suffers pain and discomfort on her right-hand side and till this date she has not received any medical attention;

CONCLUSIONS OF LAW

The courts are under a duty to and will intervene to protect the incarcerated persons from such infringements of their constitutional rights. Jordan v. Arnold, 472 F.Supp 265 (M.D. Pa. 1979); Taylor v. Stewart, 600 F.2d 1135 (5th Cir. 1979); Robson v. Biester, 420 A.2d 9 (Pa. Commw. Ct. 1980). However, federal courts are limited in their intervention into the operations of institutions to the issue of whether there are constitutional violations. In Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court said:

> ". . .There was a time not too long ago when the federal judiciary took a completely "hands-off" approach to the problem of prison administration. In recent years, however,

> these courts largely have discarded this "hands-off" attitude and have waded into this complex arena."

Similarly, in Rhodes v. Chapman, 452 U.S. 337 (1981), the Supreme Court reinforced its holding in Bell v. Wolfish, and admonished the lower federal courts that in determining whether prison conditions constitute cruel and unusual punishment under federal standards, federal courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution, or to the sociological problems of how best to achieve the goals of the prison in the criminal justice system.

Prisoners must prove a culpable mental state on the part of prison officials. Such proof is an essential element in a claim that prison conditions violate the Eighth Amendment's prohibition of cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97 (1976); Whiteley v. Albers, 475 U.S. 312 (1986) and Rhodes v. Chapman were observed by the Supreme Court as showing that a mental element is implicit in the Eighth Amendment's language. The cases require a prisoner to show "deliberate indifference" on the part of the official.

The Supreme Court indicated that there is no difference between cases involving prison-wide conditions of confinement and cases alleging unconstitutional acts or omissions directed at particular prisoners. The Supreme Court remanded these cases for reconsideration. 1/

A significant Supreme Court pronouncement on Eighth Amendment claims arising from unconstitutional conditions of confinement is Farmer v. Brennan, 511 U.S.

---

1/ This indication by the Court could explain the confusion about the standard to be used in an excessive force claim later raised by Hudson v. McMillian.

825 (1994), which involved the rape of an inmate. Farmer claimed that the Wardens and officials in the two prisons acted with "deliberate indifference" to his safety in violation of the Eighth Amendment because they knew that the penitentiary had a violent environment and a history of inmate assaults and that plaintiff would be particularly vulnerable to sexual attack if placed in the general inmate population. The Supreme Court held that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety (emphasis added); the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must also draw the inference.

In Taylor v. Michigan Department of Corrections, 69 F.3d 76 (6th Cir. 1995), the basis of the prisoner's Eighth Amendment claim was that the Warden knew about the risk of sexual assault in the camp program to small, vulnerable-looking prisoners such as Taylor, and neither had a policy to identify and screen out potential transferees who would not be safe in the camp, nor created guidelines for prison staff to follow when screening inmates for transfer. The Sixth Circuit pointed out that, in 1910, Winston Churchill coined a phrase and recognized an obvious truth when he said that the "treatment of crime and criminals is one of the most unfailing tests of civilization of any country." 2/ Prisons are dangerous places because they house dangerous people in congested conditions. But the Eighth Amendment to the U.S. Constitution mandates that prison officials maintain humane conditions of confinement and take reasonable measures to guarantee the safety of inmates. Their duty includes

2/ Addressing the issue of prison reform, Winston Churchill made these remarks before the House of Commons in 1910 while he was Home Secretary.

protecting prisoners from violence at the hands of other prisoners: "Having stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." Farmer v. Brennan, 511 U.S. 825 (1994).

Here, Relator was forced to be in a "threatening" environment by a prison official. Relator and two other inmates -- one of whom was an adversary, were confined in one cell encouraged by the prison official to "duke it out". The action of this prison official is clearly against any correctional officer's rules of ethical conduct. Sergeant Bonn and Officer Wilson both acted with "deliberate indifference" to the safety of Relator with full knowledge that Relator would be particularly vulnerable to be attacked. Not only did these prison officials know of the risk of endangering the life of Relator and two other lives of Inmates Dougherty and Olsen, but blatantly encouraged that they go ahead and cause injuries to themselves by "duking" it out. There is no way that this Court will not find that these prison officials were aware and very conscious of the substantial risk of serious harm existing but nonchalantly disregards their duty to the inmates' health and safety.

Applying Farmer, Relator is entitled to have the trier of fact determine whether the conditions that exist in this matter here are outright cruel and unusual "punishments" due to the "deliberate indifference" of prison officials at Lemon Creek Correctional Center in Juneau, Alaska. Relator Sheakley believes so! Although Relator is now imprisoned in another facility, Relator contends that an injunction cannot be denied to inmates who plainly prove an unsafe, life-threatening condition on the ground that nothing yet has happened to them. See: Hutto v. Finney, 437 U.S. 678 (1978).

CONCLUSION

1. By reasons of the facts and circumstances heretofore recited, Relator contends that there was "deliberate indifference" to her safety in violation of the Eighth Amendment to the U.S. Constitution with total disregard to her health or safety while incarcerated at the Lemon Creek Correctional Center.

2. In order that further facts in behalf of the Relator on this Application may be presented to this honorable Court, it is respectfully urged that the Court set a date for a hearing.

3. At the time this Court orders the Warden of the institution that said Relator is imprisoned to appear at a duly set hearing of this Application, Relator will request from this Court that it consider appointing counsel to represent Relator in this matter.

4. No other application for this relief has heretofore been made to any court or judge.

WHEREFORE, Petitioner prays that a Writ of Habeas Corpus issue herein directed to the said Warden of the Federal Prison Camp, commanding her to produce the body of the Relator, FRANCES SHEAKLEY, before this Court at a time and place to be specified in said Writ, to the end that this Court may inquire into the cause of the Relator's detention, at Lemon Creek Correctional Center and the extent of damages caused by the "deliberate indifference" of prison officials at said facility. Petitioner prays further that this Court subpoena the camera tape from said Lemon Creek Correctional Center or for a temporary restraining Order to be issued restraining Respondent from removing or causing to be erased and/or altered, and Petitioner also further prays for such other and further relief, such as punitive damages and compensation for the pain and suffering she has suffered and still suffers from

broken ribs and other related pain and suffering, and any other relief as to the Court may seem just and proper.

I declare under penalty of perjury that the above is true and correct.

DATED this 6 day of October, 2005.

Frances Sheakley
FRANCES SHEAKLEY, Pro Se

CERTIFICATE OF SERVICE

I, FRANCES SHEAKLEY, Petitioner herein, declare that I forward a copy of this Petition for Writ of Habeas Corpus to Respondent at the following address:

Warden
Lemon Creek Correctional Center
2000 Lemon Creek Road
Juneau, Alaska 99801

via Air Mail, postage prepaid, on 6th day of October, 2005.

Frances Sheakley
FRANCES SHEAKLEY, Pro Se